UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUMA JONES, MARK ALLEN, and : | |
| KENNETH COMBS, : | |
|     Plaintiffs, : | |
| : | |
| v. : | 3:13-cv-01007-WWE |
| : | |
| EAST HARTFORD POLICE DEPARTMENT : | |
| and MARK SIROIS, : | |
|     Defendants. : | |

**MEMORANDUM OF DECISION**
**ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

    This is an action by African-American police officers against the town of East Hartford Police Department and its former police chief, alleging racial discrimination, retaliation, and intentional infliction of emotional distress.

    Counts I, IV, V, and VIII of the fourth amended complaint are asserted on behalf of plaintiff Juma Jones; Counts II, IV, V, VI, and VII on behalf of Mark Allen; and Counts III, IV, and VIII on behalf of Kenneth Combs.

    Counts I - III allege a practice of racial discrimination in violation of the Fourteenth Amendment against the Town and Chiefs Sirois and Sansom in their official capacities. Count IV alleges intentional infliction of emotional distress against Chiefs Sirois and Sansom in their individual capacities. Count V alleges retaliation in violation of the Fourteenth Amendment as to the Town. Count VI alleges racial discrimination in violation of Title VII as to the Town. Count VII alleges retaliation in violation of Title VII as to the Town. Count VIII alleges racial discrimination in violation of the Connecticut Fair Employment Practice Act ("CFEPA") as to the Town.

## BACKGROUND

The following factual background is reflected in the parties' evidentiary submissions.

Scott Sansom is the current chief of police for the East Hartford Police Department ("EHPD"). Chief Sansom is listed as a defendant on plaintiffs' fourth amended complaint, but he has not been served with a copy of the summons and complaint, and is not listed on the docket.

In 2001, after serving as acting chief for approximately one year, Mark Sirois was selected as the permanent chief of police. Sirois retired on January 1, 2014.

The chief of police makes all decisions for the EHPD concerning discipline, hiring and firing. The EHPD rules and regulations allow the chief to consider an employee's history when handing down discipline.

**Juma Jones**

Jones was employed by the Town as a police officer from December 2003 until February 22, 2013, approximately nine years.

On January 11, 2013, Jones was arrested for alleged domestic violence. The alleged victim reported to the Hartford Police Department that she was Jones' ex-girlfriend, that Jones would not stop calling her, and that he showed up at her house and would not leave. The alleged victim was unaware of how Jones knew of her residential address. Jones admitted to the Hartford Police Department that he had obtained his ex-girlfriend's address from his work computer. As a result, Chief Sirois initiated an internal affairs investigation concerning Jones' use of the COLLECT computer system, a database operated by the State of Connecticut for law enforcement purposes. The investigation found that Jones had violated multiple section of the

2

EHPD Rules and Regulations and the policy of the COLLECT system. On February 4, 2013, Jones was arrested for 3 counts of computer crime in the third degree.

On February 22, 2013, Chief Sirois terminated Jones' employment based on the findings that Jones (1) engaged in personal conduct that lead to his arrest by the Hartford Police Department; (2) knowingly accessed the COLLECT system on three separate occasions to obtain information for personal reasons; and (3) knowingly entered inaccurate information on the COLLECT system.

**Mark Allen**

Officer Allen has been employed by the EHPD as a police officer since 1995.

In 2011, Allen conducted an internal affairs investigation into a complaint against Lt. Curt Stoldt, concerning the belittlement of another officer. Allen substantiated the charges against Stoldt. Thereafter, Allen claims that Stoldt harassed him.

On April 13, 2011, Stoldt complained that Allen had gone to the mayor's office and discussed an open internal affairs investigation with the mayor and her secretary, Karen Noel. Deputy Chief Vibberts conducted an investigation. Ms. Noel denied that she had spoken with Allen, and Allen was not disciplined.

In May 2011, Stoldt made verbal and written complaints to human resources alleging that Allen had sexually harassed a 22-year-old female reporter. Stoldt also complained that Allen had spread false rumors about him, that he believed Allen held a grudge against him, and that Allen had improperly investigated him. Stoldt subsequently filed a complaint with the Chief Sirois regarding these same issues. Allen contended that Stoldt was fabricating these issues as a form of retaliation due to Allen's internal affairs investigation of Stoldt. An investigation found

Stoldt's complaints did not substantiate any wrongdoing on the part of Allen.

On September 8, 2011, Allen filed a complaint against Stoldt. Allen reported that he was speaking with Stacey Dew and Officer Ian Allison in Ms. Dew's office when Stoldt entered and asked, "what, is this a convention?" Ms. Dew asked if he was scared. Stoldt responded, "No, I dated a black girl in college."

Officer Allen's complaint was investigated. Deputy Chief Vibberts concluded that Stoldt had violated Town policy. Mr. Cassetta likewise issued a memo stating that Stoldt's statements were contrary to the spirit of the policy prohibiting harassment, but that he did not believe there was a hostile work environment. Accordingly, Stoldt was not disciplined, but he did receive counseling by the chief of police.

In January 2012, Allen filed a complaint with HR alleging harassment by Stoldt. Allen reiterated his complaint about the "convention" comment. He also complained that Stoldt had made a subsequent derogatory remark. Officer Allen reported that, in November 2011, Stoldt approached Allen and Lt. Rosa, and said, "What's up, boys?" After Stoldt walked away, Lt. Rosa immediately expressed his concern to Allen that Stoldt had made such a remark. As part of his January 2012 complaint, Allen also alleged that Stoldt had made some false complaints against him; had during his Garrity interview accused him of being insane; had attempted to solicit information to use against him; had excluded him at a Fight for Hunger event; and had veracity issues.

The Town hired Halloran & Halloran ("Halloran") to investigate Allen's complaint. On May 10, 2012, Halloran issued its report. Halloran concluded that the two comments, the convention comment and the "boys" comment, over the course of three months did not rise to the

level of a hostile work environment. Halloran also found no violation of the retaliation policy. Halloran, however, recommended some corrective action. In April 2012, Stoldt received harassment training.

Allen did not file any subsequent complaints alleging racial discrimination or harassment. Aside from Stoldt, no one else employed by the EHPD ever made any comments to Allen that he found to be racially derogatory or offensive.

On November 23, 2012, Allen was found to have violated General Order 50, for failure to notify a supervisor of potential employee misconduct concerning an investigation. Allen was issued a reprimand. On January 17, 2013, Allen was involuntarily transferred out of OPS. In February 2013, Allen was notified that he did not get a School Resource Officer ("SRO") position, which he had applied for, and which Deputy Chief Thurnauer and Deputy Chief Vibberts had allegedly told him they would support him.

**Kenneth Combs**

Officer Combs was employed by the Town of East Hartford from March 12, 1984 to November 2, 2013. This was his first job in law enforcement. He was hired as a patrol officer. Combs was promoted to sergeant in October 1993. He held that rank until he was demoted.

Lt. Tomkiel was Combs' immediate supervisor for the last one or two years of his employment. Lt. Mormino was Combs' immediate supervisor prior to Lt. Tomkiel. Lt. Stoldt was Combs' immediate supervisor prior to Lt. Mormino. Chief Sirois was the Chief of Police at the time of Combs' retirement.

Combs was demoted after an investigation into a citizen complaint, alleging that a sergeant in an EHPD uniform had behaved inappropriately while he was at the Kahoots Bar and

Restaurant located at 639 Main Street on Friday, August 31, 2012. Specifically, the citizen alleged that he watched the sergeant embrace and fondle a dancer at Kahoots, and that the sergeant failed to take enforcement action despite witnessing several violations of the sexually-oriented business town ordinance, liquor control regulations, and/or the laws of the State of Connecticut. Officer Allen (Plaintiff) and Lt. Rosa went to Kahoots, watched the establishment's video surveillance footage, and identified Combs as the subject of the citizen's allegations. Combs was notified that there would be an IA investigation.

Officer Allen (Plaintiff) and Lt. Rosa conducted the investigation. The investigation found that Combs violated §§ 4.14, 4.3, 5.6 and 8.5 of the EHPD Rules and Regulations. As a result, Chief Sirois reduced Combs' rank from sergeant to officer.

During his Garrity Interview, Combs admitted:

- He probably embraced some of the women working at Kahoots;
- He gave a couple of people hugs, male and females;
- He believed he was at Kahoots on two separate occasions the night of August 31st, for a total of 50-60 minutes, and that he did not call off on the radio;
- When he had worked under Lt. Deborah Mormino, she had told him not to stop at Kahoots while on duty, but since he did not work under her anymore, he did not feel he need to comply with that order.

The investigation revealed that, upon moving to midnights in 2010, Lt. Mormino directed the entire squad to not hang out at Kahoots while on duty. On November 11, 2010, after having given that directive, Lt. Mormino observed Combs' cruiser in the Kahoots parking lot and then entered the establishment and found him hanging out inside. Lt. Mormino reminded Combs of her order; she advised him that image is important in their line of work and that he should not be going to Kahoots to socialize.

Combs had a very extensive disciplinary history prior to the August 31, 2012 Kahoots

6

incident, which included reprimands and suspensions.

On December 19, 2012, Lt. Mormino emailed Combs to advise him that she had boxed up some of his items from the A Squad Sergeants' desk and left it on the desk. Lt. Mormino asked Combs to remove the items, and explained that if the items were still on the desk when she returned to work on January 2, 2013, she would assume that the items were of no importance and they would be thrown away. She copied the three A Squad lieutenants on the email.

On December 23, 2012, Combs responded to Lt. Mormino, copying the same three lieutenants and adding the three A Squad sergeants. Combs stated that he had been given permission by the sergeants to leave his items there, and he questioned Lt. Mormino's authority to touch his items, let alone throw them away. Combs questioned Lt. Mormino's motivation, adding that "[t]his is starting to look like it is personal, not professional."

On January 2, 2013, Lt. Mormino returned to work and observed Combs' items still in the sergeants' office. At 10:25 p.m., five minutes prior to Combs' shift starting, Lt. Mormino emailed Combs, copying the lieutenants only, and explained that she was giving Combs a direct order to remove his items from the Sergeants' office. Lt. Mormino directed Combs not to respond to her email.

At approximately 1:00 a.m. on January 3, 2013, Lt. Mormino ordered Combs to remove his belongings from the sergeant's office before returning to his beat. Combs demanded to know the basis for her order. Lt. Mormino said that she did not need one, and asked him if he was refusing a direct order. Combs answered that he was not.

Combs recorded this conversation with Lt. Mormino on his phone. Lt. Mormino saw that he was recording their conversation and told him to stop recording. Combs' responded, "I'm

not." Unbeknownst to Lt. Mormino, Combs continued recording their conversation.

Approximately one hour later, on January 3, 2013, Combs forwarded his email chain with Lt. Mormino to Deputy Chief Vibberts, copying the three lieutenants (not Lt. Mormino), and Michael Weglarz, the union president. Combs also detailed his verbal conversation with Lt. Mormino. Combs stated that it was his belief "that Lt. Mormino's actions are not based on professional needs or requirements but are a personal attack based on her years of previously serving under [him] and having issues with [him] and other supervisors at that time." Combs also stated that he believed Mormino's actions "may also be racially motivated."

An IA investigation was conducted into Combs' conduct with respect to Lt. Mormino's request to remove his belongings from the sergeants' office and his recording of Lt. Mormino. The investigation also addressed Combs' theory of possible racial motivation. (Id.) Deputy Chief Vibberts and Acting Commander Ken Rosa conducted the investigation. During his Garrity Interview, Combs explained that he recorded the conversation with Lt. Mormino on his phone in plain sight. He admitted that:

- Lt. Mormino told him to stop recording the conversation;
- He responded, "I'm not;" and
- He continued recording the conversation.

Combs explained that by "I'm not," he meant "I'm not going to stop taping you."

As to his claim of a possible racial motivation, Combs stated that he believed Lt. Mormino was treating him differently from a "personal standpoint," and that he thought Lt. Mormino had also taken a hard line with Plaintiff Jones with respect to "managing cases and report writing." Combs denied that Jones had ever mentioned to him that he felt targeted because of his race. Combs did not identify any other issues he had ever had with Lt. Mormino

8

aside from her asking him to move his belongings from the sergeants' office. Combs denied that Lt. Mormino ever said anything to him with regard to comments, words or specific actions related to his race. The investigation found that the Combs' claim of racial motivation was unsubstantiated. The investigation concluded that Combs was insubordinate in disobeying an order by Lt. Mormino to stop tape recording her.

Chief Sirois found that Combs was both insubordinate and disrespectful, in violation of §§ 4.1, 4.4, 5.5 and 5.6, of the EHPD Rules and regulations. As a result, Chief Sirois suspended Combs for two weeks, without pay.

Pursuant to the Town's retirement plan which included Combs, officers were eligible to retire after their 25th anniversary, and were required to retire by their 30th anniversary. Combs retired a few months before he was required to do so.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

### Excusable Neglect

Plaintiffs have prolonged this action by failing to meet deadlines. Defendants have repeatedly objected to plaintiffs' delay, arguing that plaintiffs have not demonstrated good cause or excusable neglect and that permission to make late filings should be denied.

Rule 6 governs the computation and extension of time. It provides in relevant part:

> (b) Extending Time.
> (1) In General. When an act may or must be done within a specified time, the court may, for good cause, extend the time:
> (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or
> (B) on motion made after the time has expired if the party failed to act because of excusable neglect.

"Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 392 (1993).

In determining whether neglect is excusable, a court should take account of all relevant

circumstances surrounding the party's omission, including (1) the danger of prejudice to the non-moving party; (2) the length of the delay and its impact on the judicial proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith.  Id at 395.

Here, the prejudice to defendants is relatively minimal aside from the delay itself, and the Court does not infer bad faith on behalf of plaintiffs' counsel.  Accordingly, factors (1) and (4) weigh in favor of plaintiffs.  However, plaintiffs' pattern of delay in this case is notable.  Any one of these delays may not be significant on its own, but plaintiffs have repeatedly prolonged this action by failing to meet deadlines, as illustrated below.

On August 13, 2014, defendants filed a motion to compel plaintiffs to file answers to defendants' first set of interrogatories and requests for production.  Plaintiffs failed to respond. On September 4, 2014, the Court granted defendants' motion to compel and ordered that plaintiffs serve their responses by September 15, 2014, noting that failure to provide responses may result in sanctions.

On October 8, 2014, defendants filed motions for sanctions against plaintiffs Allen and Combs for their failure to comply with the Court's September 4, 2014 order.  The Court granted defendants' motion, precluding Allen from introducing documentary evidence to support his disparate treatment and retaliation claims; and Combs from introducing into evidence any documents in support of his claims of disparate treatment.  Moreover, the Court instructed that if interrogatory responses were not verified by November 10, 2014, plaintiffs would be precluded from introducing into evidence any facts contained therein.  Plaintiffs failed to meet the November 10 deadline.

The deadline for filing a response to Allen and Combs' motion for summary judgment

was extended to September 16, 2015.  Plaintiffs failed to meet that deadline.  On September 30, 2015, plaintiff filed a *nunc pro tunc* motion for extension of time both to respond to defendants' motion for summary judgment and to conduct additional discovery.  The Court denied plaintiffs' request to conduct additional discovery but granted them additional time, until October 31, 2015, to file a response to defendants' motions for summary judgment.  The Court ordered that no further extensions would be granted, as plaintiffs had not met their burden of demonstrating good cause under Local Rule 7(b)2 or of demonstrating excusable neglect under Federal Rule 6(b)(1)(B).  The Court further observed that if a busy schedule were sufficient to meet both standards, all deadlines would be rendered hollow.

On October 31, 2015, plaintiffs filed another motion for extension of time to respond to defendants' motions for summary judgment.  The Court granted the plaintiffs' motion, extending the response deadline to November 9, 2015.  Plaintiffs failed to meet that deadline.

On November 25, 2015, plaintiffs filed a motion for permission to make a late filing.  Plaintiffs' motion did not specify the amount of time sought.  Again citing counsel's busy schedule, plaintiffs submitted that their motion was supported by good cause in that, if granted, "the court may have the benefit of all pertinent evidence in ruling on the motion for summary judgment."

On November 30, 2015, plaintiffs submitted their response.  On December 31, 2015, plaintiffs submitted their Local Rule 56(a)2 statement of material facts.

The second factor, length of these delays and their impact on the judicial proceedings, weighs against plaintiffs.

The third factor, the reason for the delay, also weighs against plaintiffs.  Moreover, courts

have routinely held that fault in the delay is the most important single factor.  See City of Chanute, Kan. v. Williams Natural Gas Co., 31 F.3d 1041, 1046 (10th Cir. 1994); United States v. Twomey, 845 F.2d 1132, 1134 (1st Cir. 1988); Webster v. Pacesetter, Inc., 270 F. Supp. 2d 9, 14 (D.D.C. 2003).

The excusable neglect analysis only comes into play where, as here, a party has already missed a deadline and moves for extension after the original time has expired.  See Fed. R. Civ. P. 6(b)(1)(B).  In the instant case, plaintiffs' counsel submits that she was unable to meet the various deadlines in the case merely "[a]s a consequence of [other] various professional matters." [Doc. # 85] (citing involvement in three other proceedings).  Other legal work is not a reasonable excuse for failure to meet federal litigation deadlines, and it is certainly not a reasonable excuse for failing to request an extension of time prior to expiration of the original deadline.

Although it may seem harsh to penalize a client for the conduct of his counsel, the Supreme Court has instructed that such consideration is not appropriate, as clients are accountable for the acts of their attorneys.  See Pioneer 507 U.S. at 396.

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Link v. Wabash R. Co., 370 U.S. 626, 634 (1962).

The Court finds plaintiffs' counsel's neglect in this case to be inexcusable.  Accordingly the case may be dismissed on this ground alone.  Nevertheless, in large part due to counsel's

failure to meet deadlines and to submit full responses, summary judgment may also be granted "on the merits."[1]

**Counts I - III: Racial Discrimination in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983**

Defendants argue that plaintiffs' race discrimination claims fail because non-class plaintiffs cannot assert pattern and practice claims. Alternatively, defendants contend that plaintiffs have failed to offer evidence of pattern and practice race discrimination.

"Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause . . ." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). "[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality-or an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." Id. at 226.

The disparate impact theory of liability is not available for Section 1983 equal protection claims because proof of discriminatory intent is required to demonstrate a violation of the Equal Protection Clause, whereas disparate impact theory bases liability on discriminatory effect alone. See Reynolds v. Barrett, 685 F. 3d 193, 201 (2d Cir. 2012). Similarly, the pattern-or-practice method of proof is not available to private non-class plaintiffs because shifting the burden to employers to prove that they did not discriminate would "conflict with the Supreme Court's oft-repeated holding in the context of disparate-treatment, private nonclass litigation that the

---

[1]The Court uses the term merits loosely, as aside from missed deadlines, procedural missteps by plaintiffs and sanctions imposed by the Court essentially prevented the case from being prosecuted fully and properly.

ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." See Chin v. Port Authority of New York & New Jersey, 685 F. 3d 135, 149.

Plaintiffs do not directly respond to defendants' argument regarding their method of proof. However, plaintiffs cannot succeed, even on a disparate treatment theory of liability, as Judge Fitzsimmons precluded Allen and Combs from introducing any facts in support of their disparate treatment claims. Likewise, Jones never filed a Local Rule 56(a)2 statement. Accordingly, "[a]ll material facts set forth in [defendants'] statement and supported by the evidence will be deemed admitted" against Jones. See Local Rule 56(a)1. After review of defendants' statements of fact and the record evidence, the Court finds that no material issue of fact remains for trial. Notwithstanding all reasonable inferences against defendants, the Court finds that plaintiffs have failed to make a sufficient showing on their equal protection claims.

**Count IV: Intentional Infliction of Emotional Distress**

Defendants argue that (1) Chief Sirois is entitled to absolute privilege; (2) plaintiffs failed to exhaust their administrative remedies; (3) the alleged conduct is not extreme and outrageous as a matter of law; and (4) Chief Sansom, who was never served with the summons and complaint, is not a proper defendant.

Plaintiffs failed to address their intentional infliction of emotional distress claims in their responses. Accordingly, the Court finds that these claims have been abandoned. See Jackson v. Federal Exp., 766 F. 3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

**Count V: Retaliation in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983**

Defendants move for summary judgment on three grounds: (1) Plaintiffs (Jones and Allen) were not engaged in protected conduct under the Fourteenth Amendment; (2) there is no evidence of an official policy, practice, or custom of retaliation as required for a Monell claim; and (3) plaintiffs cannot establish that they were denied a constitutional right.  Plaintiffs again failed to address defendants arguments in their response.  Accordingly, the Court finds the retaliation claims to be abandoned.

**Count VI: Racial Discrimination in violation of Title VII**

Allen is the only plaintiff asserting this claim.  As discussed above, Allen is precluded from introducing any facts in support of his disparate treatment claims.  Accordingly, summary judgment will be granted in favor of defendants on this claim.

**Count VII: Retaliation in violation of Title VII**

Allen is the only plaintiff asserting this claim.  Allen is precluded from introducing any facts in support of his retaliation claims.  Accordingly, summary judgment will be granted in favor of defendants on this claim.

**Count XIII: Racial Discrimination in violation of the CFEPA**

Count XIII is asserted on behalf of Combs and Jones.  As discussed above, Combs is precluded from introducing evidence in support of his disparate treatment claims, so summary judgment will be granted in favor of defendants with respect to Combs.

Jones never filed a Local Rule 56(a)2 statement, so all material facts set forth in defendants' statement and supported by the evidence will be deemed admitted against Jones.

Notwithstanding all reasonable inferences against defendants, the Court finds that Jones has failed to make a sufficient showing on his CFEPA claims.  Specifically, the Court finds that the Town demonstrated legitimate, nondiscriminatory reasons for its actions: Jones' improper use of police databases.  Jones has not demonstrated that the Town's actions were pretext.  After review defendants' statements of fact and the record evidence, the Court finds that no material issue of fact remains for trial with respect to Jones' claim.  Accordingly, summary judgment will be granted in defendants' favor.

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment [Docs. # 68, 73] are GRANTED.  The Clerk is instructed to close this case.

Dated this 31st day of March, 2016, at Bridgeport, Connecticut.

    /s/Warren W. Eginton
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE